Good morning, your honors. May it please the court. My name is Harini Raghupathy from the Federal Defenders on behalf of the appellant, Mr. Cecilio Caicedo-Cuero. The government chose to hail Mr. Caicedo into the Southern District of California to be prosecuted under United States drug laws. But Mr. Caicedo is a Colombian national with no ties to the U.S. He was arrested aboard the Emporio, a Colombian flag vessel headed toward Panama, and he was found in international waters off the coast of Colombia. But rather than leaving enforcement to the Colombian or Panamanian authorities, the government chose to prosecute him in the United States, all the while failing to establish a sufficient nexus. So in the district court, the primary way the government sought to get around this attenuated nexus was to call its expert witness, DEA Special Agent Wasser. And by the way, he was not challenged as an expert. His expertise was not challenged at the trial court level. Is that not correct? Correct. He was certified as an expert, but the scope of his certification was limited to, he was qualified as an expert on the subject of Colombian narcotics trafficking to the U.S. He was challenged the scope of his certification on that grounds. But what was argued below as part of the motion to dismiss was that missing from his expertise was he wasn't an expert on Colombian narcotics trafficking to either Europe or West Africa. And the government, in fact, acknowledged that below. And so what he, he got involved in cases once the United States became involved in prosecutions, and presumably once a nexus to the United States has already been established. But he acknowledged that he wasn't involved in seizures, investigating seizures of cocaine that were going to Europe or going to West Africa. And so I think this is important because it shows that there was a nonrandom sample in which he was basing his opinion. It's as though he was starting from a stack deck of cards and he was opining on the basis of that stack deck. So he didn't see the other half of the equation, which was narcotics going from Colombia's Pacific coast to Europe or West Africa. Well, he expressed opinions that fast boats just weren't used to transport cocaine or other illegal drugs to Europe or West Africa. I think he said that something that they never see and he hadn't heard of it in consultation. So he did express an opinion. And you're saying that opinion was unqualified and uncertifiable? I think the opinion is of limited probative value and it doesn't constitute a nexus by a preponderance of the evidence. And there are, I think, three reasons why that's the case. One is that his opinion was based on an extremely limited sample size. He acknowledged that he only investigated six different trafficking organizations out of the many different trafficking organizations operating along Colombia's Pacific coast. And so he wasn't familiar with the methods and routes used by a majority or even all of the drug trafficking organizations operating along Colombia's Pacific coast. So there's the issue of the sample size. And then I think even if the sample size were sufficient, there's the issue of the scope of his expertise and knowledge. As I was saying, he wasn't an expert on Colombian trafficking to Europe or West Africa. And so there was a sort of sampling bias that occurred in his opinion. And then I think the third problem was that, again, as the government acknowledged, the scope on which he was certified as an expert by the district court was just on trafficking to the United States. And so given that limited scope, I don't think his opinion carries the probative weight that the district court accorded to it, because he just simply wasn't qualified to testify about narcotics trafficking to Europe. Stewart. So your contention is that there was a failure of proof, that it was insufficient by itself? He clearly he clearly is qualified to say narcotics coming off the west coast of Colombia, headed in a northwest direction on smaller but very, very fast boats, is the kind of stuff that ends up in the United States. Correct. Your problem is that it doesn't, that he wasn't able to say, and I can exclude the possibility or I can at least tell you that it's a very unlikely possibility that traffic coming in that direction would have ended up in Europe. Correct. So the government's burden here is to show more likely than not that the Emporio load was destined for the United States. The burden of proof is a preponderance. And he was able to show that one possible destination was the United States, but he wasn't able to exclude the possibility that the drugs were also going to Europe. Even given two facts, the extensive drug use in the United States, the demand for cocaine in the United States, and the fact that it's coming off the west coast of Colombia in an unlikely direction and headed towards an area of Panama that is a staging area for the United States. Correct. Well, I actually think those two factors, we don't dispute those facts, but the significance of those facts, I think is, I would point to a contrary interpretation. So the United States consumes 36% of the world's cocaine, but it was also established that Europe and West Africa together consumed 34%. So it's a mere 2% difference in the size. And the government below described a 4% differential in size as quibbling. And so I would argue that a 2% differential in size. Let's suppose that those things were in equipoise. What do we do with the fact that it's coming off the west coast of Colombia instead of the northeast coast, and that it's headed towards, again, a staging area of Panama where it's unlikely the speedboat is not going to go through the canal? Well, I think coming off the west coast doesn't say much because Agent Mosser himself acknowledged that there was this well-established smuggling corridor from the Pacific coast of Colombia through the canal to Europe. And so it comes down to the fact that essentially the boat was going slightly west of the Panama Canal. Yeah, but there's also the fact that the fast boats are not going to go through Miraflores. They're not going to go through the locks at Panama. It's going to have to be offloaded someplace and then unloaded onto something much larger to get it through the locks. Correct. And I don't think the evidence that was established excludes that possibility because what we have was 494 kilograms found aboard the GO Fast, which was actually, Agent Mosser said, a typical GO Fast load is generally 1,800 kilograms. And so this was much smaller than a typical load, suggesting that it was going to be stockpiled on land, an aggregate load was going to be accumulated, and that aggregate load would be transferred onto a container vessel. And we know from Agent Mosser's testimony that container vessels leave Panama, they go through the canal, and they move to Europe. And so the GO Fast vessel, the evidence is consistent with the GO Fast vessel making the first leg of the journey toward Panama, where the cocaine would then be transferred onto land, stockpiled, and then subsequently moved on a container vessel and transported through the canal to Europe. What do we make of the fact that the defendant put on no contrary evidence? Anything? I don't think so, Your Honor, because the burden of proof here is on the government. And the Defense Council did submit six articles below into evidence that showed that the cocaine does leave the Pacific coast of South America on container vessels and go through the canal to Europe. So we did present some evidence. We didn't present live evidence. Yeah, I guess I should have said no testimony. Right. But I don't think that that changes the calculus here, because, again, it's the government's burden of proof. But if the articles that you supplied suggest that containers leave the west coast of Colombia, this is not a container. Those are much larger ships that can go through the locks. Correct. But Agent Wasser, that's true. But I think where we get the GO Fast vessel in conjunction with containers is from Agent Wasser's own opinion. And he stated that GO Fast vessels are often used as an intermediary mode of transport, and they're used on the first leg of a journey. And it's frequent for the cocaine to then be taken off of the GO Fast vessel, stockpiled on land, and moved to a larger vessel that can then move larger loads of cocaine to its final destination. But I thought the record shows that Agent Wasser indicated that that is something they just don't see, is using GO Fast vessels in connection with cocaine that's ultimate destination is in Europe or West Africa. My understanding of the record was that his testimony was that GO Fast vessels don't move directly from the Pacific coast of Colombia to Europe. So the GO Fast vessel itself wouldn't be the vessel that was traversing the canal. The load would then have to be moved onto a larger container vessel. And if I could please reserve that remainder. I've got a question. Would you please stop the clock, because I don't want this to come off of your time, because it's in a way off to one side. I mean, we see a lot of these cases, not these specific facts, but cases where there's an interception of a vessel offshore, and they throw the contraband overboard, and it floats. My question is, why didn't they attach concrete to each one of these things so they sink? Because at that point, all you have is an empty vessel, and they saw them throw packages overboard, but we don't know what they are. Why don't these guys sink them? I don't get it. I guess they don't listen to the oral argument and read the cases, and they should learn from that in the future, but that's a good question. Okay, well, it's off to one side on this case. Okay, so I didn't take that off your time. You've got a minute left. Thank you very much. May it please the Court. Aaron Clark for the United States. Your Honors, the cocaine season this case was headed for the United States. That was a factual finding made by the District Court, and that factual finding allowed the Court to then determine the legal sufficiency of a nexus to the United States. Now, is it a factual finding to which we must give deference as if this were sort of conflicting he said, she said? I mean, there are no disputed facts. The question is, what do we conclude from the facts? Isn't that right? Well, Your Honor, I didn't think there were many disputed facts, though it seems this is a dispute about what it is that Agent Wasser actually said. Well, I got that part, but, I mean, he said what he said. Nobody is there saying Agent Walker is wrong about what he said in the sense that he's lying. So I'm trying to figure out the standard of review, obviously. You'd much prefer clear error. I got that. Well, for the District Court's factual findings, Your Honor, yes, I think that clear error is the appropriate standard of review. And one of the factual findings that he made in this case was that the cocaine was coming to the United States. It was an inferential fact that he derived from the other facts that had been established here. I understand that there is still de novo review as to whether those factual determinations become a preponderance of the evidence, but those are two separate findings that the Court made here. The standard for whether or not there's sufficient nexus is not if the drugs were coming to the United States, although that can be sufficient. As has been laid out in Zakharovitz, whether an attempted transaction aimed at causing criminal acts within the United States or that the plan for shipping drugs was likely to have effects in the United States. The fact that it was coming to the United States is one of the effects that we've shown here. And it's the government's position that that finding, that it was coming to the United States, should be reviewed for clear error. Now there's been some dispute here about what it is that Agent Wasser seems to have said. He was specifically asked in this evidence you're hearing about cocaine that had been shipped by GO-FAST vessels from the western coast of Colombia. And he had been asked if in any of his experience, in his 500 plus interviews that he had done, in his consultation with authorities in these foreign nations, whether he had ever heard of cocaine leaving from the western coast of Colombia in a GO-FAST vessel headed in the northwest direction that was ultimately headed to Europe or West Africa. And he said unequivocally, no, I've never heard of that. And he further said it's counterintuitive. It's just something that we don't see. He further said, Your Honors, that every time he had asked a facilitator that he had debriefed or a cell leader who was responsible for shipping these cocaine by the GO-FAST vessels, every time he had asked them about a load that had been seized or lost that had been shipped by a GO-FAST vessel on the western coast of Colombia, they had told him that that cocaine was ultimately headed to the United States. And that's a fact that is not discussed much in appellant's briefing, but that the court credited and said he was well informed and well reasoned in his opinions. What I think, what I don't want to be lost here, Your Honors, is that if we make this case just about the markings, and it's always about the markings, it's always about whether or not there are navigational charts, we are essentially giving a road map that can be controlled to the people who are shipping these drugs to the United States. It's in the record, it's not disputed that once they were spotted by the United States Coast Guard, the crew members aboard the Emporio threw the bales of cocaine into the water. And they threw the radio that they had been using to communicate with their superiors into the water. One of the persons who was leading the voyage or driving the vessel also apparently threw his compass into the water. So I don't, I would hope that we would not put defendants, quick thinking defendants in a position where they can reward themselves and avoid prosecution in the United States simply by not marking the packages or changing the markings every time or quickly throwing anything that might be damaging to them into the water before they can be apprehended by the Coast Guard. Yeah. And maybe, I hope they don't hear me questioning why didn't you make the thing sink? Well, Your Honor, we can use reason and common sense to try to figure that out. But if they were to, obviously the cocaine is buoyant in there. And if they were to weight it down sufficiently that it will sink, then they can't carry as much cocaine on board those It's harder to throw off if they're all weighted with concrete. Yeah. It cannot be clear error for the district court to have credited Agent Wasser's testimony. As we've heard here this morning, it was not disputed. Defense took some of his statements and tried to twist them to open up the possibility that a vessel of cocaine on a, a GO Fest vessel loaded with cocaine might have been headed to Panama and then loaded onto a container vessel and then shipped backwards toward the Panama Canal. But that is not something that was ever in the experience of Agent Wasser that he had ever heard of. It was something that ran counterintuitive and against common sense. And I think that it's been clearly established here that there was, that there was nexus to the United States and that the Absent any further questions, your honors, I'm prepared to wait the rest of my time. Thank you. Response. Briefly, your honors, two points. Regarding the standard of review, I think the issue is resolved by United States versus Davis. And in that court, excuse me, in that case, the court held that the question of the application of the Maritime Drug Law Enforcement Act to a mixed question of fact and law, which is review de novo. And there, the appellant was raising the exact same contention that we're raising here, whether on undisputed historical facts was there a sufficient nexus to survive due process. And the court applied a de novo analysis. Well, what do you make of the MedJet case that indicated it was clear that standard of review was clear error with respect to a finding that some portion of drugs would enter the United States? I would say that to the extent that it is clear error, I think that we survived that analysis for the reasons that I discussed previously, which is that Agent Wasser's opinion was limited. And my opponent discussed why Agent Wasser had never seen drugs going from the western coast of Colombia to Europe. But again, I think that's a reflection of the limited sample on which he based his opinions. He was a United States law enforcement agent. He only saw cocaine seizures that were headed to the United States. And so his opinion was necessarily flawed because it wasn't based on a representative sample. And then lastly, to the extent that today's decision would somehow give a loophole to drug traffickers, I think the reverse policy argument could also be made that by choosing not to prosecute drug-related crimes that have no nexus to the U.S., we're actually upholding due process, we're promoting principles of comedy and fundamental unfairness. And for those reasons, I would ask that this Court vacate the conviction and directions to dismiss the indictment. Thank you. Okay. Thank you very much. Thank both sides for their helpful argument. The foregoing case is now submitted for decision.
judges: Settle, Fletcher, Bybee